IN THE UNITED STATES DISTRIC COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| HAYDEN HARRISON and<br>BILL JAMES, individually and on<br>behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL MOTORS COMPANY<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____ |

## CLASS ACTION COMPLAINT

General Motors entered into a binding warrant agreement – an agreement that explicitly identified warrantholders as third-party beneficiaries – and then unilaterally changed the terms of the agreement to the detriment of warrantholders.

Plaintiffs bring this class action on behalf of themselves and other warrantholders to seek remedies related to GM's wrongful conduct. In support of their Complaint, Plaintiffs respectfully submit the following:

### PARTIES

1.    Plaintiff Hayden Harrison is a resident of Greene County, Missouri.

2.    Plaintiff Bill James is a resident of Greene County, Missouri.

3.    Defendant General Motors Company is a Delaware corporation with its principal executive office in Detroit, Michigan. It may be served via its registered agent CSC of St. Louis County, Inc.; 130 South Bemiston Avenue, Suite 700; Clayton, Missouri 63105.

1

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under the Class Action Fairness Act, codified at 28 U.S.C. § 1332(d).

5.      This Court has personal jurisdiction over Defendants because they conduct substantial business in this district.

6.      Venue is proper in this district under 28 U.S.C. § 1391.

7.      Venue is proper in this division under this Court's Local Rule 3.2(a)(3) and (b)(3).

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### The Creation of GM's Series A Warrants

8.      In April 2011, General Motors Company ("GM") registered a series of warrants with the Securities and Exchange Commission. GM registered the warrants via Form 8-A, and registered them under Section 12(b) of the Exchange Act.

9.      GM registered two classes of warrants: one class expiring on July 10, 2016, and another expiring on July 10, 2019.[1] GM generally referred to the warrants expiring in July 2016 as the "Series A Warrants."

10.     The Series A Warrants were "warrants to acquire 136,363,635 shares of [GM's] common stock, par value of $0.01 per share, exercisable at any time prior to July 10, 2016, with an exercise price of $10.00 per share . . ." *See* Form 8-A at Item 1 (April 20, 2011).

_____

[1]      The latter category of warrants – those expiring in July 2019 – are known as the Series B Warrants. Those warrants are not at issue in this litigation.

11.     Two key documents governed the creation of the Series A Warrants: (1) Form 8-A, and (2) the Amended and Restated Warrant Agreement. Form 8-A incorporates and makes reference to the Warrant Agreement.

### SEC Form 8-A

12.     Under the heading "Expiration Date," Form 8-A articulates that the Series A Warrants have an expiration date of July 10, 2016.

13.     Under the heading "Procedures for Exercise," the Form expresses that "[a]ll or any portion of the Warrants may be exercised at any time prior to 5:00 p.m., New York City time, on the Expiration Date . . ."

14.     Form 8-A provided GM with certain adjustment rights concerning the Series A Warrants. However, it also provided that "[w]ritten notice of adjustments will be promptly provided to the holders of Warrants after any adjustment."

15.     Under the "Amendment" heading, GM outlined the narrow circumstances under which it could alter the terms governing the Series A Warrants.

16.     Regarding the Warrant Agreement, it stated that GM could modify or amend the Warrant Agreement "for the purposes of curing any ambiguity or correcting or supplementing any defective provision contained in the Warrant Agreements; provided that such modification or amendment does not adversely affect the interests of the holders of the Warrants in any respect."

17.     Form 8-A also stated that GM could amend only certain provisions of the Warrant Agreement with "the consent of each affected holder of a Warrant." The provisions that required the consent of warrantholders included:

- changes in the expiration date;

- increases in the exercise price or decrease the number of Warrants . . .;

- impairments of the warrantholders' right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

- impairments or adverse actions that affect the exercise rights of holders of the Warrants . . .; and

- actions that would deprive any holders of the Warrants of any economic rights, privileges or benefits that arise under or are provided pursuant to the Warrant Agreements and/or the Warrants . . . .

*See* Form 8-A at p. 9.

### *Warrant Agreement*

18. In addition to Form 8-A, the Warrant Agreement between GM and U.S. Bank National Association ("USB") governed the terms of the Series A Warrants. GM attached the Warrant Agreement to its Form 8-A as an exhibit and incorporated its terms into its filing with the SEC.

19. Under the Warrant Agreement, GM acted as the issuer of the Series A Warrants while USB was charged with representing GM in the "issuance, exchange, transfer, substitution and exercise of Warrants."

20. The Warrant Agreement defined "Close of Business" to mean "5:00 p.m. New York City time."

21. It also defined "Expiration Date" for "any Warrant" to be July 10, 2016.

22. Section 3.01 of the Warrant Agreement states, "At any time prior to 5:00 p.m. New York City time, on the Expiration Date, a Warrantholder shall be entitled to

exercise . . . the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name . . . Any Warrants not exercised prior to such time shall expire unexercised."

23.     Section 5.04 is titled "No Impairment." It states, "The Company will not, by . . . any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such actions as may be necessary or appropriate in order to protect the rights of the Warrantholder."

24.     The Warrant Agreement reiterated the representation from Form 8-A concerning modifications to the Warrant Agreement. Section 6.03 stated that GM could modify or amend the Warrant Agreement "for the purposes of curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement; *provided* that such modification or amendment does not adversely affect the interests of the holders of the Warrants in any respect." (emphasis in original).

25.     Section 6.03 also stated that "no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

- change the Expiration Date;

- increase the Exercise Price or decrease the Number of Warrants . . .;

- impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

- impair or adversely affect the exercise rights of Warrantholders . . .;

- deprive any Warrantholder of any economic rights, privileges or benefits that arise under or are provided pursuant to this Warrant Agreement and/or the Warrants . . . ."

26.     Section 7.17 of the Warrant Agreement provides that the Agreement acts for the benefit of warrantholders and they are its beneficiaries. It states, "Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement . . . and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders."

27.     The Warrant Agreement contemplated that warrantholders may exercise their warrants on a non-trading day, and if the exercise occurred such that it would be after the Expiration Date, then the exercise would be deemed to occur on the last Trading Day prior to the Expiration Date.

28.     Section 3.02(b) of the Warrant Agreement states that if the Exercise Date "is not a Trading Day or the Warrantholder satisfies such requirements [for exercise] after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day, *unless that Trading Day falls after the Expiration Date, in which case the Exercise Date shall be the immediately preceding Trading Day.*" (emphasis added).

## Series A Warrants As Publicly Traded Securities

29.     In addition to creating the Series A Warrants, GM also caused them to be listed and publicly traded.

30.     According to the Form 8-A, GM applied to list the Series A Warrants on the New York Stock Exchange under the symbol "GM.WS.A."

31.     The Series A Warrants also were represented on the NYSE by the ticker symbol GM+A.

32.     The Series A Warrants were associated with CUSIP 37045V118.

33.     As of July 1, 2016, the Series A Warrants were trading on the NYSE at $18.86.

34.     On July 5, 2016, the NYSE submitted to the SEC a Form 25 notifying the regulatory agency that it intended to de-list GM's Series A Warrants from the New York Stock Exchange.

35.     The NYSE's Form 25 was filed pursuant to 17 C.F.R. § 12d2-2(a)(3) and it stated that the Series A Warrants were "suspended from trading on July 5, 2016 pursuant to the No Guaranteed Delivery provision." The Form 25 continued to identify the Series A Warrants as expiring on July 10, 2016.

36.     Under 17 C.F.R. § 12d2-2, an issuer (in this case, GM) seeking to de-list a security must – contemporaneously with its Form 25 – "publish notice of such intention, along with its reasons for such withdrawal, via a press release and, if it has a publicly available Web site, posting such notice on that Web site. Any notice provided on an issuer's Web site under this paragraph shall remain available until the delisting on Form 25 has become effective pursuant to paragraph (d)(1) of this section." *Id.* at (c)(2)(iii).

37.     The regulation also states, "If the issuer has not arranged for listing and/or registration on another national securities exchange . . . then the press release and posting on the Web site must contain this information." *Id.*

38.     GM did not comply with section (c)(2)(iii) of the applicable regulation.

39.     The applicable regulation also requires a 10-day notice period before the de-listing of any security. *See* 17 C.F.R. § 12d2-2(c)(2)(ii).

40.     GM did not comply with section (c)(2)(ii) of the applicable regulation.

**GM Alters the Series A Warrants to the Detriment of Warrantholders**

41.     On June 27, 2016 – merely four days before it terminated the trading of the Series A Warrants – GM posted a notice on its website that stated:

> GM today issued a reminder to warrant holders that the company's publicly traded Series A warrants are set to expire on Sunday, July 10, 2016. Because the expiration date is not a trading day on the NYSE, warrants will not be exercisable after the Depository & Trust Clearing Corporation's (DTCC) cutoff time for exercises on Friday, July 8, 2016. The warrants have been trading under the symbol (NYSE: GM.WS.A), and were originally issued in July 2009. The NYSE has notified GM that it will suspend trading in the warrants after the close of trading on July 1, 2016 so that all trades can be settled by July 8, 2016.
>
> As of June 24, 2016, there were approximately 11.7 million redeemable warrants outstanding. The warrants have an exercise price of $10.00 per share.
>
> A warrant holder can obtain further information on exercising the warrants by contacting their broker or U.S. Bank National Association, GM's warrant agent. Brokers are encouraged to contact U.S. Bank National Association or the DTCC in advance of the expiration date to confirm the procedures for exercising warrants and payments of exercise prices.
>
> Any warrant not exercised prior to the cutoff time on July 8, 2016 will expire and be canceled, and the holder will not receive any shares of GM common stock.

*GM Issues Reminder Regarding Warrant Expiration*, Corporate Newsroom (www.gm.com) (June 27, 2016).

42.    GM's Reminder was the first indication of any kind that (1) the expiration date for the Series A Warrants was being accelerated to Friday, July 8, and (2) that the Series A Warrants would not be traded or recognized on the NYSE after July 1, 2016.

43.    Other than publishing its Reminder on its website, GM did not distribute its Reminder or any other notice to warrantholders.

44.    But even GM's Reminder was insufficient. At the same time that it published its Reminder, GM's Investor website contained contradictory information. Under the Frequently Asked Questions section, GM stated the following concerning the Series A Warrants:

> Q:    Are the warrants currently exercisable and/or tradable?
>
> A:    Both Warrant A, expiring July 10, 2016 with CUSIP [], and Warrant B, expiring July 10, 2019 with CUSIP [], are currently exercisable and tradable. The exercise price for Warrant A expiring July 10,2016 (CUSIP []) is $10 . . . Strike prices may change due to certain events, such as a stock dividend or stock split. There are no restrictions on shares of common stock post exercise.

*Warrant Holders Information*, Investor FAQ (www.gm.com).

45.    GM's FAQ section did not notify investors of the adjusted expiration date, or that the NYSE would no longer trade the warrants after July 1.

46.    GM's FAQ section did not remind investors that the warrants would have no value if they expired.

47.    Thus, GM's own Reminder contradicted its FAQ section, and GM did not provide information concerning the adjustments to the warrants on its FAQ section – the

9

very portion of the website that investors were most likely to check for information concerning the warrants.

48.     GM's FAQ section was updated, but still does not provide thorough or complete information concerning the warrants. It currently states:

Q:     Are the Warrants A currently exercisable and/or tradable?

A:     The Warrants A, CUSIP [], expired on Sunday, July 10, 2016. All unexercised Warrants A expired and were canceled automatically, and holders did not receive any shares of GM common stock.

**Plaintiffs' Experience with the GM Warrants**

*Hayden Harrison*

49.     Harrison opened his account with Scottrade in 2005.

50.     Harrison previously owned General Motors bonds. After General Motors declared bankruptcy in 2011, GM issued warrants to its bondholders.

51.     Harrison did not request GM warrants. Instead, the warrants appeared in his Scottrade account in lieu of his GM bonds.

52.     Harrison did not receive any communications about the warrants or their terms from GM or Scottrade.

53.     As part of the post-bankruptcy transaction, Harrison received 353 GM Series A Warrants. He continued to hold those warrants in his Scottrade account number *****233 until July 2016.

54.     Harrison did not own GM warrants through any other account other than his Scottrade account number *****233.

55.     On Harrison's Scottrade account statements, the warrants were described as "GENERAL MTRS CO WT EXP 071016," thereby reflecting an expiration date of July 10, 2016.

56.     As of June 30, 2016, Harrison's 353 warrants were individually valued at $18.42, with a cumulative value of $6,502.26.

57.     On or about July 5, 2016, Harrison checked his Scottrade account containing the GM warrants and noted that they showed a zero value.

58.     On that same day, Harrison called GM's Investor Relations department about his warrants. GM told him it did not have any record of who owned the warrants, that the warrants were no longer active, and that Harrison should contact his broker.

59.     On or about July 5, 2016, Harrison called Scottrade's office located 1905 South Glenstone Avenue in Springfield, Missouri. Upon information and belief, Harrison spoke with Christopher Lewis, a broker at Scottrade's office in Springfield, Missouri.

60.     Lewis advised Harrison that his GM warrants were "zeroed out" and "untradeable." Lewis stated he would contact Scottrade in St. Louis to get more information.

61.     Approximately two days later, Lewis contacted Harrison and advised him to contact GM directly. Lewis told Harrison, "There's nothing we can do" and that Lewis was instructed to have Harrison contact GM directly.

62.     During the week of July 11, Rick Guistolise, the manager of the Scottrade office in Springfield, Missouri, contacted Harrison about the warrants. He advised Harrison that the warrants were expired, and that he could have converted the warrants

into GM common shares, but the warrants ceased trading on July 1, 2016. Guistolise advised Harrison to contact GM directly about the warrants.

63.     According to Harrison's Scottrade account statement for July 2016, the GM warrants were deemed a "Worthless Security" on July 20, 2016. The statement reflected 353 GM warrants with a value of $0.00.

### Bill James

64.     James opened his Scottrade account *****308 in 2006.

65.     James owned GM bonds in his Scottrade account. After GM's bankruptcy in 2011, James received GM Series A warrants in lieu of his bonds.

66.     James did not request GM warrants. Instead, the warrants appeared in his Scottrade account in lieu of his GM bonds.

67.     James did not receive any communications about the warrants or their terms from GM or Scottrade.

68.     James received 590 GM Series A Warrants. He continued to hold those warrants in his Scottrade account number *****308 until July 2016.

69.     James did not own GM warrants through any other account other than his Scottrade account number *****308.

70.     On James's Scottrade account statements, the warrants were described as "GENERAL MTRS CO WT EXP 071016," thereby reflecting an expiration date of July 10, 2016.

71.     As of June 30, 2016, James's 590 warrants were individually valued at $18.42, with a cumulative value of $10,867.80.

72. On or about July 5, 2016, James checked his Scottrade account containing the GM warrants and noted that they showed a zero value.

73. On or about July 5, via telephone, James contacted Scottrade's office located at 1905 South Glenstone Avenue in Springfield, Missouri.

74. James spoke with Lewis, the same broker who also visited with Harrison. Lewis told him that Scottrade possibly could have assisted him with the warrants if James had come to the Scottrade office prior to July 1.

75. James also contacted GM Investor Relations the week of July 5. GM told James that it did not know anything about the warrants, or who owned them.

76. During the week of July 11, James contacted Scottrade's Springfield office again via telephone and visited with Guistolise. Guistolise advised him that there was nothing Scottrade could do to assist him, and Scottrade did not notify warrantholders of the upcoming expiration because it was on their account statement.

77. According to James's Scottrade account statement for July 2016, the GM warrants were deemed a "Worthless Security" on July 20, 2016. The statement reflected 590 GM warrants with a value of $0.00.

## CLASS ACTION ALLEGATIONS

78. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

79. Plaintiffs bring this class action and seek certification of the claims on behalf of the following Class:

> **All warrantholders who owned General Motors Series
> A Warrants on June 27, 2016.**

80.     Plaintiffs reserve the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

81.     Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns.

82.     This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

83.     **Numerosity – Rule 23(a)(1).**  Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

84.     **Existence and Predominance of Common Questions of Law and Fact – Rule 23(a)(2), 23(b)(3).**  Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

   a.   Whether GM violated 17 C.F.R. § 240.12d2-2 and its notice provisions;

   b.   Whether Plaintiffs are entitled to declaratory relief;

   c.   Whether GM breached the Warrant Agreement;

   d.   Whether GM breached its duty of good faith and fair dealing;

e.  Whether GM was unjustly enriched by its wrongful conduct;

f.  Whether GM was negligent;

g.  Whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

h.  Whether and to what extent Class members are entitled to damages and other monetary relief;

i.  Whether and to what extent Class members are entitled to equitable relief, including declaratory relief, restitution, rescission, a preliminary and/or a permanent injunction; and

j.  Whether and to what extent Class members are entitled to attorneys' fees and costs.

85.     **<u>Typicality – Rule 23(a)(3)</u>.**  Plaintiffs' claims are typical of the claims of the Class because they were warrantholders who owned Series A Warrants as of June 27, 2016. Plaintiffs' claims are typical of the claims of the members of the Class as the claims arise from the same course of conduct by Defendant, and the relief sought within the Class is common to the members of each.

86.     **<u>Adequacy of Representation – Rule 23(a)(4)</u>.**  Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

87.     **<u>Superiority – Rule 23(b)(3)</u>.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages

or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

88.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.      The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant;

b.      The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.   Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## COUNT ONE
### Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*
### (Brought on behalf of the Class against General Motors Company)

89.   Plaintiffs, on behalf of themselves and the Class, hereby re-allege the paragraphs above as if fully set forth herein.

90.   Under 28 U.S.C. § 2201, where there is an "actual controversy" within its jurisdiction, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

91.   There is an actual controversy between Plaintiffs and GM concerning:

a.   Whether GM complied with 17 C.F.R. § 240.12d2-2 and its notice provisions, and

b.   Whether GM breached the Warrant Agreement;

92.   Accordingly, Plaintiffs seek a declaration that GM (1) violated 17 C.F.R. § 240.12d2-2 and its notice provisions, and (2) breached the Warrant Agreement.

93.   The declaratory relief requested herein will generate common answers that will settle the controversy related to GM's conduct. There is an economy to resolving these issues, as they have the potential to eliminate the need for continued and repeated litigation.

## COUNT TWO
## Breach of Contract
## (Brought on behalf of the Class against General Motors Company)

94.     Plaintiffs, on behalf of themselves and the Class, hereby re-allege the paragraphs above as if fully set forth herein.

95.     The Warrant Agreement between GM and USB constitutes a binding, enforceable contract.

96.     The Warrant Agreement expressly provides that warrantholders are third-party beneficiaries of the Warrant Agreement.

97.     Plaintiffs and the Class were warrantholders and therefore third-party beneficiaries of the Warrant Agreement.

98.     GM breached the Warrant Agreement when it modified its terms to the detriment of warrantholders.

99.     GM breached the Warrant Agreement when it did not obtain the consent or affirmative vote of warrantholders to modify the terms of the Warrant Agreement.

100.     GM breached the Warrant Agreement when it did not provide notice of its modifications of the Warrant Agreement to warrantholders.

101.     GM breached the Warrant Agreement when it did not honor the exercise provisions regarding non-trading days, expressed in section 3.02(b) of the Warrant Agreement.

102.     GM breached the Warrant Agreement when it de-listed the Series A Warrants from trading on the NYSE effective July 1, 2016.

103.     GM breached the Warrant Agreement when it accelerated the expiration date of the Series A Warrants to July 8, 2016.

104. Plaintiffs and the Class suffered damage because of GM's conduct.

105. Plaintiffs, individually and on behalf of the Class, seek equitable relief, including rescission, and all damages permitted by law in an amount to be proven at trial, as well as attorneys' fees.

**COUNT THREE**
**Breach of Duty of Good Faith and Fair Dealing**
**(Brought on behalf of the Class against General Motors Company)**

106. Plaintiffs, on behalf of themselves and the Class, hereby re-allege the paragraphs above as if fully set forth herein.

107. The Warrant Agreement between GM and USB constitutes a binding, enforceable contract.

108. The Warrant Agreement expressly provides that warrantholders are third-party beneficiaries of the Warrant Agreement.

109. Plaintiffs and the Class were warrantholders, and therefore third-party beneficiaries of the Warrant Agreement.

110. Under the Warrant Agreement, GM had a duty to warrantholders of good faith and fair dealing.

111. This duty prevented GM from performing in such a manner as to evade the spirit of the transaction or so as to deny another party the expected benefit of the Warrant Agreement.

112. It also prevented GM from interfering with or failing to cooperate with the warrantholders' performance, including trading of the Series A Warrants and/or redeeming them.

113.    GM violated its duty of good faith and fair dealing when it announced the changes to the Warrant Agreement on June 27, 2016, merely four days before the accelerated trading deadline on July 1.

114.    GM violated its duty of good faith and fair dealing when it published contradictory information regarding the Series A Warrants on June 27, 2016.

115.    GM's conduct interfered with Plaintiffs' and the Class's performance under the Warrant Agreement, and denied them the expected benefit of the Warrant Agreement.

116.    Plaintiffs and the Class were damaged by GM's breach of its duty of good faith and fair dealing.

117.    GM's breach of its duty of good faith and fair dealing is distinct and independent from its breach of the Warrant Agreement.

118.    Plaintiffs, individually and on behalf of the Class, seek equitable relief, including rescission, and all damages permitted by law in an amount to be proven at trial, as well as attorneys' fees.

**COUNT FOUR**
**Unjust Enrichment**
**(Brought on behalf of the Class against General Motors Company)**

119.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the paragraphs above as if fully set forth herein.

120.    As set forth herein, GM violated the Warrant Agreement.

121.    As a result of GM's wrongful conduct, warrantholders were unable to redeem their Series A Warrants for GM's common stock.

20

122.     Thus, because of its wrongful conduct, GM obtained monies in that it retained the common shares of its stock that could have been redeemed by warrantholders.

123.     GM appreciated, accepted and retained the non-gratuitous benefits (i.e., profits and retention of its common stock) conferred by Plaintiffs and the Class.

124.     It would be inequitable and unjust for GM to retain these wrongfully obtained profits.

125.     GM's retention of these wrongfully-obtained profits would violate the fundamental principles of justice, equity and good conscience.

126.     Plaintiffs and the Class are entitled to restitution of the profits unjustly obtained, plus interest.

## COUNT FIVE
### Negligence
**(Brought on behalf of the Class against General Motors Company)**

127.     Plaintiffs, on behalf of themselves and the Class, hereby re-allege the paragraphs above as if fully set forth herein.

128.     GM owed duties to Plaintiff and members of the Class, specifically duties related to notice under 17 C.F.R. § 240.12d2-2.

129.     GM breached its duty when it failed to comply with 17 C.F.R. § 240.12d2-2.

130.     As a result of GM's negligence, Plaintiffs and the Class suffered damage.

131.     Plaintiffs, individually and on behalf of the Class, seek equitable relief, including rescission, and all damages permitted by law in an amount to be proven at trial, as well as attorneys' fees.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated persons, requests judgment and relief as follows:

1.     For an order certifying the proposed Class, and appointing Plaintiffs and their counsel of record to represent the proposed Class;

2.     For an order declaring that GM violated 17 C.F.R. § 240.12d2-2 and its notice provisions;

3.     For an order declaring that GM breached the Warrant Agreement;

4.     For an order declaring that GM violated its duty of good faith and fair dealing;

5.     For an order declaring that GM was unjustly enriched by its wrongful conduct;

6.     For an order declaring that GM was negligent;

7.     For an order awarding Plaintiffs and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

8.     For an order awarding Plaintiffs and Class members restitution, disgorgement, rescission, or other equitable relief as the Court deems proper;

9.     For an order awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

10.     For an order awarding such other and further relief as this Court deems just and proper.

DATED: May 5, 2017                   Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

_____/s/ Matthew L. Dameron_____
Matthew L. Dameron
Missouri Bar Number 52093
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:      (816) 945-7135
Facsimile:       (816) 945-7118
Email:             matt@williamsdirks.com

*Counsel for Plaintiffs and the*
*Proposed Class*